**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| JOHN EAST, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CROSS and BLUE SHIELD of LOUISIANA,<br>LOUISIANA HEALTH COOPERATIVE, INC., and<br>VANTAGE HEALTH PLAN, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.:  14-115

Section

Magistrate

**COMPLAINT- CLASS ACTION**

**JURY DEMANDED**

Plaintiff JOHN EAST, individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs" or the "Plaintiff Class"), through his undersigned counsel, for his Complaint against Defendants BLUE CROSS AND BLUE SHIELD OF LOUISIANA, LOUISIANA HEALTH COOPERATIVE, INC., and VANTAGE HEALTH PLAN, INC., (collectively, "Defendants"), alleges the following upon knowledge as to his individual conduct and interactions and upon information and belief as to the conduct of others:

**PRELIMINARY STATEMENT**

1.     This action seeks injunctive and declaratory relief to halt Defendants' abrupt and systematic policy of targeted discrimination on the basis of Plaintiffs' disability, *i.e.*, their

1

infection with the human immunodeficiency virus ("HIV"),[1] in violation of sections 1557(a) and

1311(c) of the Patient Protection and Affordable Care Act (codified at 42 U.S.C. §§ 18116(a)

and 18031), and in contravention of Louisiana state law.

    2.      To ensure equal access to health care under the Affordable Care Act, Congress

placed robust antidiscrimination requirements on health insurers that profit from the billions of

federal dollars flowing into the health care insurance market and from the vast new market of

health insurance consumers made available to insurers through the Affordable Care Act's health

insurance exchanges.

    3.      One such safeguard is section 1557 of the Affordable Care Act, which expressly

prohibits health insurers that receive federal funds, as do Defendants, as well as entities

established under Title I of the Affordable Care Act, from discriminating against any individual

on the basis of a disability for purposes of the individual's participation in or enjoyment of the

benefits of health insurance coverage.

    4.      The "Plaintiff Class" consists of all Louisiana residents living with HIV who are

qualified for health insurance premium assistance from the Ryan White HIV/AIDS Program.[2]

    5.      The Plaintiff Class includes a subclass of persons who have existing or past

insured relationships with one or more Defendants ("Insured Plaintiffs").

    6.      The Plaintiff Class is fully eligible for coverage under Defendants' available

plans.  Insured Plaintiffs have been paying their premiums in full—some of them for decades—

and all Plaintiffs are and remain ready, willing, and able to pay premiums with federal funds

designed precisely for that purpose.

---

[1] HIV, when left untreated, causes AIDS.
[2] The Ryan White HIV/AIDS Program is a federal program that makes grants to states, cities, and non-profit organizations to provide people living with HIV with access to health care, including by assisting in the payment of health insurance premiums.

7.    The Plaintiff Class benefits from health insurance premium assistance funded by federal grant money from the Ryan White HIV/AIDS Program, which is available exclusively for people living with HIV in need of financial assistance, and without which none of the Plaintiffs can afford individual health insurance premiums.

8.    Defendants have routinely accepted funds from the Ryan White HIV/AIDS Program ("Ryan White Funds") for dozens of their policy-holders' health insurance premiums. Blue Cross and Blue Shield of Louisiana ("BCBS") has accepted Ryan White Funds since at least 2009, and upon information and belief, the other defendants have accepted such funds since each began offering health insurance in Louisiana and Ryan White HIV/AIDS Program premium assistance became available through the Louisiana Health Insurance Program.

9.    In or around January 2014, however, BCBS took the position that it would no longer accept Ryan White Funds for premium payments and advised the Louisiana Health Insurance Program of this change to its longstanding policy of accepting these payments.

10.    BCBS's new policy excludes Plaintiff class members from access to BCBS coverage, which Plaintiffs can afford only with Ryan White Funds, as surely as if BCBS had posted a sign saying "low-income people with HIV need not apply."

11.    BCBS's abrupt policy change coincides with the open enrollment period of the Affordable Care Act's insurance exchange marketplace. BCBS's initial explanation for its dubiously timed policy change was guidance issued by the Centers for Medicare & Medicaid Services ("CMS," a lead federal agency administering the Affordable Care Act) on November 4, 2013 (the "November 2013 Regulatory Guidance"). This guidance discouraged insurers from accepting third-party premium payments from *hospitals, health care providers, and other commercial entities* that might fraudulently seek to attract health care consumers with promises

3

to make their premium payments, or to defray the costs of otherwise uncompensated care by paying the premiums of those whose coverage would soon lapse.

12.     That guidance, however, did ***not*** discourage insurers from accepting payments from other sources, such as federal programs designed specifically to provide premium support. In fact, in a more recent statement, CMS expressly stated that its earlier guidance regarding third-party premium payments "does not apply to payments for premiums and cost sharing made on behalf of QHP [Qualfied Health Plan] enrollees by . . . state and federal government programs or grantees (such as the Ryan White HIV/AIDS Program)."

13.     Even after CMS repudiated BCBS's sole justification for refusing these payments, BCBS did not acknowledge its misinterpretation—or mischaracterization—of the earlier guidance and did not resume its longstanding policy to accept Ryan White HIV/AIDS Program payments.

14.     Instead, BCBS disregarded CMS' clarification and doubled-down on its discriminatory actions, thereby attempting to skew the Louisiana health insurance market in its favor.  BCBS issued a statement on February 13, 2014 making clear that it was going ahead with its discriminatory policy, which would have the effect of keeping low-income individuals living with HIV from enrolling in a BCBS individual insurance plan.

15.     In turn, the other state-wide insurers in Louisiana have followed BCBS's lead. Around the time that CMS issued its clarifying guidance, Defendant Louisiana Health Cooperative, Inc. ("Louisiana Health Cooperative") began informing enrollees that it too would no longer accept Ryan White HIV/AIDS Program third-party premium payments.  Shortly thereafter, Vantage Health Plan, Inc. ("Vantage") announced that while it would continue to

4

accept such payments for the time-being, it would reconsider its policy if BCBS and the Louisiana Health Cooperative continued to refuse Ryan White Funds.

16.     To avoid the costs associated with more people living with HIV on their insurance rolls, Defendants are intentionally discriminating against Ryan White Funds recipients.

17.     Indeed, in an email that was recently made public, a Congressional staffer in Senator Mary Landrieu's office wrote that

> *BCBS LA told me their decision was not due to the CMS [Centers for Medicare & Medicaid Services] guidance or any confusion (as we thought before) but was in fact due to adverse selection concerns.*

18.     The National Association of Insurance Commissions defines adverse selection to include "insurance purchasing decisions based on [consumers'] own knowledge of their insurability . . . [including when] the applicant might have information about the risk that is not known to the insurer, or the insurer might have access to the information but be unable to incorporate it fully into the price of coverage, due to factors such as antidiscrimination laws." *Adverse Selection Issues and Health Insurance Exchanges Under the Affordable Care Act*, Nat'l Ass'n of Ins. Comm'rs (2011), *available at* http://www.naic.org/store/free/ASE-OP.pdf.

19.     Against the backdrop of the Affordable Care Act prohibiting health insurers from incorporating applicants' pre-existing conditions into the price of coverage, BCBS candidly admitted that it was excluding a large group of expensive-to-insure individuals—Plaintiffs—for no other reason than to avoid adverse selection.

20.     Due to the eligibility requirements of the Ryan White HIV/AIDS Program, which is designated to be a payor of last resort, Plaintiffs by definition do not have employer-provided insurance, are ineligible for Medicare, Medicaid, or other federal health care programs, and cannot afford private insurance on their own.  Without Ryan White HIV/AIDS Program

assistance, Plaintiffs cannot obtain health insurance, without which Plaintiffs cannot maintain the continuous access to care and prescription medications that literally keep them alive.

21. Defendants' plans are Plaintiffs' only viable health insurance options.[3] Defendants' discriminatory policy of refusing to accept Ryan White Funds puts Plaintiffs in a situation that class representative John East describes as "a matter of life and death."

22. As a result of Defendants' unlawful discrimination in violation of sections 1557 and 1311 of the Affordable Care Act, hundreds—if not thousands—of low-income Louisianans with HIV face being dropped immediately from their health care coverage, and those who are currently uninsured will have no health care coverage option to which they can turn.[4]

23. As a result of Defendants' unlawful discrimination and refusal to accept Insured Plaintiffs' premium payments via the Ryan White HIV/AIDS Program, Defendants have violated their contractual obligations to Insured Plaintiffs, their duty of good faith and fair dealing, as well as other duties under state law.

---

[3] The residents of Jefferson Parish who are currently eligible for assistance through the Louisiana Health Insurance Program may be able to pay for a health insurance plan offered by Humana Medical Plan, Inc., using Ryan White Funds, though it is unclear whether that plan will adequately meet the health care needs of all of these individuals, cover the specific medications currently being prescribed to these individuals, or allow these individuals to remain with the physician currently providing them with care and treatment. Furthermore, unless the other insurers doing business in Jefferson Parish are prevented from discriminating against low-income people living with HIV and kicking them off their insurance rolls, Humana may have difficulty maintaining its position as the only insurer in Louisiana complying with the nondiscrimination mandates of the Affordable Care Act and providing these individuals with coverage.

[4] Through nondiscrimination provisions, and regulations promulgated thereunder, the ACA prohibits precisely the tactic Defendants are employing to rid their insurance rolls of people living with HIV. In addition to section 1557, section 1311 requires that participating health insurance plans not employ benefits designs or marketing practices that discourage people with significant health needs from enrolling, and regulations promulgated under section 1311 further elucidate these standards. *See, e.g.*, Section 1311(c)(1)(A) of the ACA provides that "to be certified, a plan shall, at a minimum (A) . . . not employ marketing practices or benefit designs that have the effect of discouraging the enrollment in such plan by individuals with significant health needs. . . ." *See* 42 U.S.C. § 18031. *See also, e.g.*, 45 C.F.R. § 147.104(e) (prohibiting insurers from "employ[ing] marketing practices or benefit designs that will have the effect of discouraging the enrollment of individuals with significant health needs in health insurance coverage or discriminate based on an individual's . . . present or predicted disability . . . or other health conditions"); 45 C.F.R. § 156.125(a) ("[a]n issuer does not provide EHB if its benefit design, or the implementation of its benefit design, discriminates based on an individual's . . . present or predicted disability . . . or other health conditions"); 45 C.F.R. § 156.225(b) (prohibiting insurers from "employ[ing] marketing practices or benefit designs that will have the effect of discouraging the enrollment of individuals with significant health needs").

Case 3:14-cv-00115-BAJ-RLB   Document 1   02/20/14   Page 6 of 41

24.     As a result of Defendants' longstanding practice of accepting and benefiting from Ryan White Funds, which induced Plaintiffs' reliance that Defendants would continue to do so, Defendants must also be estopped from taking their new position leaving Plaintiffs with no viable health insurance option.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) where this action arises under, *inter alia*, sections 1557 and 1331 of the Affordable Care Act and 29 U.S.C. § 794.  The Court has jurisdiction over Plaintiffs' state law claims, which arise from a common nucleus of operative facts as Plaintiffs' federal claims, pursuant to 28 U.S.C. § 1367(a).

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because, upon information and belief, Defendant BCBS resides in the Middle District of Louisiana and all Defendants are residents of Louisiana, and because all or a substantial part of the events giving rise to the claims in this action occurred and are occurring in the Middle District of Louisiana.

27.     Declaratory relief is authorized pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202.  A declaration of the law is necessary and appropriate to determine the respective rights and duties of the parties to this action.

## NAMED PARTIES
### PLAINTIFF

28.     Plaintiff John East, a resident of Louisiana, has purchased insurance coverage from BCBS continuously since 1985.  Mr. East is living with HIV.  Despite working two jobs, in 2009 Mr. East's escalating health insurance premium costs became unaffordable, and he realized he soon would be unable to make his payment on his own.  Because he is a low-income person

Case 3:14-cv-00115-BAJ-RLB   Document 1   02/20/14   Page 7 of 41

living with HIV, Mr. East qualified for and obtained Ryan White HIV/AIDS Program health insurance premium assistance.

29.     Mr. East, whose coverage with BCBS began in 1985, never missed a premium payment and his coverage never lapsed.  Since he became qualified for premium assistance in approximately 2009, BCBS has been accepting Ryan White Funds premium payments for Mr. East.

30.     At the beginning of this year, however, BCBS advised that it would no longer accept Ryan White Funds, leaving Mr. East with no means to make his premium payments. After BCBS's announcement, Mr. East's next payment was due on February 15, 2014, and he now faces the loss of health insurance for the first time in 29 years.  Mr. East has since learned that Defendant Louisiana Health Cooperative will no longer accept Ryan White HIV/AIDS Program premium payments.  He has also learned that Vantage, his only other potential option for health insurance coverage paid for with Ryan White funds, will likely follow BCBS and Louisiana Health Cooperative and stop accepting Ryan White Funds in March 2014.

### DEFENDANTS

31.     Defendant BCBS is a Louisiana corporation, with headquarters in Baton Rouge, Louisiana.  BCBS offers insurance policies to residents of every Parish in Louisiana through the federal healthcare exchange.  Defendant BCBS is the administrator for the Federal Employees Health Benefit Plan in Louisiana.  It also offers Health Maintenance Organization and Preferred Provider Organization insurance plans through the federal healthcare exchange, in connection with which it receives federal premium tax credits and cost-sharing subsidy payments directly from the federal government.  Finally, Defendant BCBS has received federal money via the very program at issue here—the Ryan White HIV/AIDS Program.

8

32.     Defendant Louisiana Health Cooperative is a non-profit health care company, with headquarters in Metairie, Louisiana.  Defendant Louisiana Health Cooperative received a loan for $65,040,660 in 2012 from the Department of Health and Human Services Consumer Oriented and Operated Plan Loan Program to assist with establishing its health insurance business.  Defendant Louisiana Health Cooperative is a "Consumer Operated and Oriented Plan" established under title I of the Affordable Care Act.  It offers Health Maintenance Organization and Point of Sale insurance plans through the federal healthcare exchange, in connection with which it receives federal premium tax credits and cost-sharing subsidy payments directly from the federal government.  Finally, Defendant Louisiana Health Cooperative has received federal money via the very program at issue here—the Ryan White HIV/AIDS Program.

33.     Defendant Vantage is a Louisiana corporation, with headquarters in Monroe, Louisiana.  It offers Point of Sale insurance plans through the federal healthcare exchange, in connection with which it receives federal premium tax credits and cost-sharing subsidy payments directly from the federal government.  Vantage also receives federal funds to administer its Medicare Advantage health insurance plans.  Finally, Defendant has received federal money via the very program at issue here—the Ryan White HIV/AIDS Program.

## CLASS ACTION ALLEGATIONS

34.     The named individual Plaintiff brings this action individually and on behalf of the Plaintiff Class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2).  The class consists of all Louisiana residents living with HIV who are qualified for health insurance premium assistance from the Ryan White HIV/AIDS Program.  The class includes a subclass of Plaintiffs who have existing or past insured relationships with one or more Defendants (defined above as "Insured Plaintiffs") who, by virtue of those relationships, are entitled to additional relief under state law.

9

35.     Numerosity.  The size of the class is indefinite, and includes at least 1400 individuals who are eligible to apply for and enroll in a health insurance policy offered by one of the Defendants—including a subset of individuals who have existing or past insured relationships with one or more Defendants—but whose premium payments will now be refused under Defendants' discriminatory policies, leaving the Plaintiff Class with no viable health insurance coverage option.

36.     Adequacy of Representation.  The named Plaintiff will represent fairly and adequately the interests of the class and subclasses defined above.  Plaintiffs' attorneys include counsel experienced in insurance, health care, and civil rights matters who have litigated cases involving similar issues and claims, and have experience in class action litigation.

37.     Common Questions of Law and Fact.  Common questions of law and fact affecting the entire class are involved, including but not limited to questions of law and fact regarding Defendants' actions, such as adopting policies that discriminate against Plaintiffs on the basis of their disability.

38.     Typicality of the Claims of Class Representatives. The named Plaintiff's claims are typical of the claims of the class as a whole, and of those of the Insured Plaintiffs subclass. The named Plaintiff is a member of the class and subclass defined herein and has suffered, and will continue to suffer, discriminatory denial of equal access to otherwise available health care coverage.  The named Plaintiff alleges that he and the members of the class and subclass he seeks to represent are and will be subject to discrimination based on disability due to the conduct complained of in this action.

**APPLICABLE LAW**

39.     Section 1557(a) of the Affordable Care Act, 42 U.S.C. § 18116(a), provides that "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be

10

subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance" on the ground prohibited under, *inter alia*, section 504 of the Rehabilitation Act.

40.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination based upon disability.  A "disability" under section 504 is "a physical or mental impairment that substantially limits one or more major life activities."  29 U.S.C. § 794(a); 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1)(A).  "[A] major life activity . . . includes the operation of a major bodily function, including . . . functions of the immune system."  42 U.S.C. § 12102(1)(A) & (2)(B).

41.     Section 1557 states that "[t]he enforcement mechanisms provided for and available under . . . section 504 . . . shall apply for purposes of [section 1557(a)]." 42 U.S.C. § 18116(a).

42.     Section 504 may be enforced by "any person aggrieved by any act or failure to act . . ." according to the same "remedies, procedures and rights set forth in[, *inter alia*,] Title VI of the Civil Rights Act."  29 U.S.C. § 794(a)(2).

43.     Section 1557 also prohibits discrimination on the basis of disability status by "any entity established under [title I of the Affordable Care Act] (or amendments)." 42 U.S.C. § 18116(a).

44.     Section 1322 of the Affordable Care Act, 42 U.S.C. § 18042, establishes the Consumer Operated and Oriented Plan ("CO-OP") program.

45.     Under section 1311(c)(1)(A) of the Affordable Care Act, a "qualified health plan" certified and offered on a federal exchange must "not employ marketing practices or benefit

11

designs that have the effect of discouraging the enrollment in such plan by individuals with significant health needs." 42 U.S.C. § 18031(c)(1)(A).

46. Section 2702(a) of the Public Health Services Act provides that "each health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every . . . individual in the State that applies for such coverage." 42 U.S.C. § 300gg-1.

47. Louisiana Revised Statute section 22:1964 ("section 1964") declares what are, in the insurance business, "[m]ethods, acts, and practices which are defined as unfair or deceptive." LA. REV. STAT. § 22:1964.

48. Section 1964(7) enumerates "unfair discrimination" as an "unfair or deceptive" practice. Section 1964(7) (incorporating Louisiana Revised Statute section 22:34) defines "unfair discrimination," *inter alia*, as

> unfair discrimination in favor of particular individuals or persons, or between insureds or subjects of insurance having substantially like insuring risk, and exposure factors, or expense elements, in the terms or conditions of any insurance contract, or in the rate or amount of premium charged therefor, or in the benefits payable or in any other rights or privileges accruing thereunder.

LA. REV. STAT. § 22:1964(7).

49. Section 1964(14)(a) enumerates as an "unfair or deceptive" practice the act of "[c]ommitting or performing with such frequency as to indicate a general business practice any of the following: (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue . . . " LA. REV. STAT. § 22:1964(14)(a).

50. Louisiana Revised Statute section 22:861 states that

> Any insurer may insert in its policies any provisions or conditions required by its plan of insurance or method of operation which are not prohibited by the provisions of this Code.

LA. REV. STAT. § 22:861.

12

51.    Louisiana Revised Statute section 22:880 states that

Any insurance policy, rider, or endorsement hereafter issued and otherwise valid, which contains any condition or provision not in compliance with the requirements of this Code, shall not be rendered invalid, but shall be construed and applied in accordance with such conditions and provisions as would have applied had such policy, rider, or endorsement been in full compliance with this Code.

LA. REV. STAT. § 22:880.

## FACTS

### *The Current State of Low-Income People Living with HIV in Louisiana*

52.    According to a study by the Centers for Disease Control and Prevention ("CDC"), Louisiana is the State with the second highest rate of HIV infection in the United States and the fourth highest rate of AIDS among adults and adolescents.

53.    As of 2012 there were nearly 19,000 people living with HIV in Louisiana. As of 2009, there were 9,228 total HIV-related deaths among people living with HIV in the state.

54.    HIV and AIDS disproportionately affect low-income populations, including in Louisiana. According to remarks by the Director of the CDC's National Center for HIV/AIDS, Dr. Jonathan Mermin, individuals with household incomes below $10,000 per year are 10 times more likely to have HIV than individuals with household incomes above $50,000 per year.

55.    Twenty-two percent of people in Louisiana are living below the Federal Poverty Level, which is set at an annual income of $11,670 for an individual in 2014.

### *Critical Importance of Continuous Health Care Coverage for People Living with HIV*

56.    According to the CDC and many peer-reviewed articles, retention and continuity of health care for people living with HIV is directly linked to better health outcomes and a significantly decreased chance of transmitting HIV to others.

13

57.     Continuity of care is critical for people living with HIV because it allows them to obtain and maintain a regimen of antiretroviral medication, reduce their viral load, and ultimately reduce mortality rates.

58.     Viral load is a measurement of the amount of HIV in an individual's blood.  It indicates the degree of infection and is used to determine treatment strategies.  A health care provider will typically test an HIV patient's viral load every three to six months, and more often when changing or starting treatment.

59.     Antiretroviral medications are the primary method of combatting HIV infection and reducing viral load.  Antiretroviral medications work by interfering with the replication process of HIV.  Standard antiretroviral treatment typically involves a combination of at least three drugs taken daily.

60.     Consistent care and treatment, including access to antiretroviral medication, has been shown to greatly reduce illness and death attributable to HIV, particularly when introduced at an early stage of infection, and can lead to a reduction in viral load to undetectable levels.

61.     Studies have shown that an undetectable viral load dramatically reduces the chance of HIV transmission and results in a life expectancy commensurate with individuals in the general population.

62.     Unfortunately in Louisiana, late diagnosis and lack of medical care contributes to a rate of death from AIDS nearly double the national average.

63.     In Louisiana, 25% of people who received an AIDS diagnosis between 2002 and 2006 died within 36 months of receiving their diagnosis.  Nationally, over the same period, 17% of people receiving an AIDS diagnosis died within 36 months.

14

*Health Insurance Options for Low-Income People Living with HIV in Louisiana*

64.    There are significant gaps in availability of affordable health care coverage for low-income people living with HIV in Louisiana.

65.    Louisiana has not expanded Medicaid coverage to include all individuals with a household income at or below 133% of the federal poverty level, as contemplated by the Medicaid expansion provisions of the Affordable Care Act.  Accordingly, low-income people living with HIV in Louisiana who are not yet eligible for Medicare may obtain health insurance coverage through Medicaid only under limited circumstances.

66.    While the Affordable Care Act's new provision for private health insurance exchanges provides an opportunity for some low-income people living with HIV to obtain insurance, affordability remains a problem.

67.    Indeed, according to a state health reform modeling project undertaken by the Harvard Law School, only 8% of Louisiana's Ryan White Funds-eligible clients will be eligible for health insurance subsidies under the Affordable Care Act.  Individuals with a household income below 100% of the Federal Poverty Level do not qualify for premium assistance through the health care exchanges.  For people living with HIV in this income group, purchasing private insurance on the exchange is impossible without the assistance of Ryan White Funds.

68.    Even people living with HIV who qualify for a subsidy to purchase private health insurance on the exchange still need Ryan White Funds to assist them in meeting their remaining individual premium obligation.

69.    Plaintiff John East is one such.  Mr. East, who is currently under-employed, cannot afford the premiums for his legacy insurance policy without assistance from the Ryan White HIV/AIDS Program.  While Mr. East also would be eligible to apply for a plan on the federal exchange, and he may qualify for a subsidy, any subsidy he would qualify for still would

15

not suffice to cover his premium payment, and he continues to need the Ryan White HIV/AIDS Program's assistance.

70.     The good news is that, with the assistance of Ryan White Funds, Plaintiffs can obtain insurance under the Affordable Care Act's protections, because no health insurance plan offered on the exchange can discriminate in coverage or price of premium based on their condition living with HIV.

***The Ryan White HIV/AIDS Program***

71.     The Ryan White HIV/AIDS Program is a critical bridge over the health insurance coverage gap for Plaintiffs, making it possible for these low-income individuals living with HIV to pay premiums for private health care coverage that they would not otherwise be able to afford.

72.     In 1990, Congress passed the Ryan White Comprehensive AIDS Resources Emergency Act (Ryan White CARE Act), funding what is now the Ryan White HIV/AIDS Program. The Ryan White HIV/AIDS Program makes grants to states, cities, and non-profit organizations to provide people living with HIV with access to health care, including by assisting in the payment of health insurance premiums.

73.     At the federal level, Ryan White Funds are administered by the Health Resources and Services Administration of the U.S. Department of Health and Human Services.

74.     In 2010, the U.S. government released the "National HIV/AIDS Strategy for the United States," reemphasizing the Ryan White HIV/AIDS Program's important role as part of the national HIV/AIDS prevention and treatment strategy. A critical goal of the "National HIV/AIDS Strategy for the United States" is to increase by 2015 the "proportion of Ryan White HIV/AIDS Program clients who are in continuous care (at least 2 visits for routine HIV medical care in 12 months at least 3 months apart) from 73% to 80% (or 237,924 people in continuous care to 260,739 people in continuous care)."

16

75.    In Louisiana, the Louisiana Health Insurance Program administers the Ryan White HIV/AIDS Program.  In fiscal year 2012, Louisiana received $50,704,888 in total funding for Ryan White Program activities.

76.    Louisiana state and municipal grantees have been accepting and utilizing Ryan White Program Funds since 1991.  These funds and the programs they support are central to Louisiana's strategy for combating HIV/AIDS.

77.    Since 1994, the Louisiana Health Insurance Program has been assisting eligible individuals—Louisiana residents living with HIV who have a household income below 300% of the Federal Poverty Level—to make their individual health insurance premium payments.

78.    The HIV/AIDS Alliance for Region II (the "HIV/AIDS Alliance") is the not-for-profit entity that administers the Louisiana Health Insurance Program's health insurance premium payment function.

79.    Potential Ryan White HIV/AIDS Program premium assistance recipients apply through the HIV/AIDS Alliance.  Once a recipient becomes enrolled, the HIV/AIDS Alliance sends premium checks to insurers on behalf of the participant.

80.    The Health Resources and Services Administration HIV/AIDS Bureau, which is the Federal Administrator of the Ryan White HIV/AIDS Program, requires Ryan White HIV/AIDS Program Grantees to make payments directly to service providers and insurance companies.  Grantees are not permitted to make direct payment to Ryan White HIV/AIDS Program beneficiaries.

81.    Well before the Affordable Care Act's implementation, Insured Plaintiffs including John East, received Ryan White HIV/AIDS Program support to pay their premiums for health insurance plans purchased in the private marketplace from BCBS and Vantage, making

17

this a critically important means for low-income people living with HIV to obtain care and treatment.

82.    With the implementation of the federally sponsored health insurance exchange in Louisiana beginning in October 2013, the federal government made clear that Ryan White HIV/AIDS Program premium support will play an equally important role in assisting low-income people living with HIV pay their private health insurance premiums for plans purchased through the exchange.

83.    Indeed, the Health Resources and Services Administration has issued many policy statements providing guidance on the continued use of Ryan White Funds as premium assistance for eligible people living with HIV to purchase and maintain health insurance plans offered on the federal exchange.

*Defendants' Past Acceptance of Ryan White Funds*

84.    Long before the implementation of the Affordable Care Act's health exchanges, Defendant BCBS, and upon information and belief Defendant Vantage, established an unequivocal pattern and practice of accepting Plaintiffs' Ryan White Funds premium payments.

85.    BCBS has continuously and habitually accepted Ryan White Funds for its policy holders' premium payments at least since as early as 2009.

86.    Vantage and Louisiana Health Cooperative also have received and accepted Ryan White Funds for its policy holders' premium payments.

87.    Plaintiff John East's most recent BCBS insurance policy includes a section entitled "Due Date for Premium Payments," which states:

> 1. Premiums are owed by Subscriber. Premiums may not be paid by third parties unless related to the Subscriber by blood or marriage. Premiums may not be paid by Hospitals, Pharmacies, Physicians, automobile insurance carriers or other insurance carriers. Company will not accept premium payments by third parties unless required by law to do so. The fact that We may have

18

previously accepted a premium from an unrelated third party does not mean that
we will accept premiums from these parties in the future.

88.     Despite this term in BCBS's recent written policy, when announcing its policy of

refusing Ryan White HIV/AIDS Program and other third-party premium payments on February

10, 2014 and again on February 13, 2014, BCBS made no mention that such a term already

existed in its insurance policies.  Rather, BCBS made its announcements on February 10 and 13,

2014 as if no such term previously existed.

89.     Despite this term in its recent written policy, BCBS announced on February 10

and 13, 2014 that the policy would not take effect until March 1, 2014, and that BCBS would

continue honoring third-party premium payments up through February 28, 2014.

90.     Despite this term in its recent written policy, BCBS went on to accept Mr. East's

(and others') Ryan White HIV/AIDS Program premium payments after Mr. East undertook his

most recent policy renewal.

91.     Wanting to ensure that his coverage never lapses, Mr. East routinely called BCBS

to ensure that BCBS had received his premium payment of Ryan White Funds and applied it

toward his account.  BCBS representatives always assured Mr. East that his Ryan White

HIV/AIDS Program premium had been received and accepted like any other premium payment.

92.     Defendants' policy, pattern, and custom of accepting Ryan White Funds caused

Insured Plaintiffs to repeatedly renew their coverage in reliance on Defendants' prior practices,

and based on their understanding that their only means of paying their premium in full—via

Ryan White Funds—was acceptable to Defendants.

93.     For instance, Plaintiff John East annually had the opportunity to renew his BCBS

policy or shop for health insurance elsewhere.  While Mr. East did make inquiries with other

19

health insurers, he always renewed his BCBS policy, largely based on his belief that there would be no issue with his Ryan White Funds payments being accepted by BCBS.

94.     Defendant BCBS's longstanding policy, pattern, and custom of accepting Ryan White Funds persisted even after BCBS inserted boilerplate language in its insurance policies that it would not receive third party premium payments.

95.     Defendants outwardly maintained their policy, pattern, and custom of accepting Ryan White Funds even on the eve of Defendants' changing that position, including at times when Defendants knew they would soon be changing that position, in furtherance of receiving and benefiting from Plaintiffs' Ryan White Funds premium payments.

*Defendants' Abrupt Change of Policy and Purported Justification*

96.     In January 2014, BCBS abruptly advised state agencies and entities administering Ryan White funds, including the Louisiana Health Insurance Program and the HIV/AIDS Alliance for Region II, that it would no longer accept Ryan White Funds for Plaintiffs' premium payments.

97.     At that time, healthcare advocates and case workers of HIV and AIDS support programs such as the NO/AIDS Task Force ("NO/AIDS") also learned that BCBS would be refusing Ryan White premium payments and that BCBS's explanation for its policy was that the November 2013 Regulatory Guidance prevented BCBS from accepting premium payments from third parties.

98.     In mid-January, Plaintiff John East learned of BCBS's policy of refusing Ryan White funds from his case worker at NO/AIDS.

99.     BCBS provided Mr. East himself with no such notice.  However, BCBS did send Mr. East his premium bill as usual.  If not for his conversation with NO/AIDS, Mr. East would

Case 3:14-cv-00115-BAJ-RLB   Document 1   02/20/14   Page 20 of 41

have continued to believe that BCBS would accept his Ryan White HIV/AIDS Program premium payments as it always had.

100.    The November 2013 Regulatory Guidance that BCBS purportedly relied on addressed CMS' concern that private or commercial parties might distort the marketplace in attracting patients to consume their healthcare services, or in shifting the costs of uncompensated care, by paying those patients' premiums or cost-sharing payments.

101.    To that end, the November 2013 Regulatory Guidance stated that "HHS [Department of Health and Human Services] discourages this practice and encourages issuers to reject such third party payments."

102.    Consistent with its purpose of targeting the practice of third parties who seek to attract patients with offers to pay premiums and cost-sharing obligations, the November 2013 Regulatory Guidance was limited to discouraging the acceptance of third-party premiums paid only by "hospitals, other healthcare providers, and other commercial entities."

103.    Nonetheless, BCBS announced publically in a February 10, 2014 media release that its policy of not accepting any third-party payments (including Ryan White Funds) was in response to the November 2013 Regulatory Guidance, which BCBS characterized as "strongly advising [insurers] not to take *any* third-party payments."  (Emphasis added.)

104.    In another media release on February 13, 2014, BCBS again offered only one justification for its policy—its purported concerns based on the November 2013 Regulatory Guidance that people or organizations might fraudulently seek to attract health care consumers with promises to make their premium payments or to defray the costs of otherwise uncompensated care by paying the premiums of those whose coverage would soon lapse.

21

105.    BCBS has offered no justification for its refusal to accept Ryan White Funds from Plaintiffs, other than its claimed inapposite concerns over "fraud, waste and abuse" as discussed in November 2013 Regulatory Guidance.

*The November 2013 Regulatory Guidance Never Supported BCBS's Only Purported Justification, and the Centers for Medicare & Medicaid Services Expressly Refuted BCBS's Incoherent Justification*

106.    BCBS's only justification for its refusal to accept Plaintiffs' Ryan White Funds premiums is a false pretext under which BCBS is attempting to keep what it perceives to be a more expensive class of insureds—people living with HIV—off its insurance rolls.

107.    On February 7, 2014, very shortly after BCBS began advising that it would reject Ryan White Funds from Plaintiffs, CMS responded with clarifying guidance (the "February 2014 Regulatory Guidance"), in Question-and-Answer format, entitled, "Third Party Payments of Premiums for Qualified Health Plans in the Marketplaces."

108.    In response to the question whether the November 2013 Regulatory Guidance applied to "premium and cost sharing payments on behalf of [Qualified Health Plan] enrollees from . . . state and federal government programs or grantees (such as the Ryan White HIV/AIDS Program)," the February 2014 Regulatory Guidance stated that it did not apply:

> *No. The November 4, 2013 FAQ does not apply to payments for premiums and cost sharing made on behalf of . . . state and federal government programs or grantees (such as the Ryan White HIV/AIDS Program). QHP issuers and Marketplaces are encouraged to accept such payments*.

(Emphasis added.)

109.    The February 2014 Regulatory Guidance went on to confirm that earlier Health Resources and Services Administration guidance on the Ryan White HIV/AIDS Program "specifically describes how grantees can use grant funds to pay premiums and cost sharing for eligible individuals enrolled in QHPs."

22

110.    BCBS's media releases of February 10, 2014 and February 13, 2014 each acknowledged the February 2014 Regulatory Guidance, but asserted that, in this more recent guidance, "CMS [Centers for Medicare & Medicaid Services] changed its position" and "issued a different communication."

111.    BCBS supported its assertion that "CMS changed its position" by asserting that the earlier November 2013 Regulatory Guidance "strongly advis[ed insurers] not to take *any* third-party payments."  (Emphasis added.)

112.    The foregoing statements by BCBS on February 10 and 13, 2014, are deliberately false and misleading.

113.    The November 2013 Regulatory Guidance did not discourage insurers from taking "any" third-party payments, but rather explicitly tailored its caution to those third-party payors that might actually seek to exploit patients with premium assistance for their own personal gain—"hospitals, other healthcare providers, and other commercial entities."

114.    The November 2013 Regulatory Guidance certainly did not include federal Ryan White Funds or any other government program specifically designed to assist people living with HIV to pay their health insurance premiums.

115.    Contrary to BCBS's assertion that "CMS changed its position" through its February 2014 Regulatory Guidance, the February 2014 Regulatory Guidance was *consistent with* the November 2013 Regulatory Guidance.  Neither supports a policy of refusing federal funds to assist Plaintiffs to pay their health insurance premiums.

116.    BCBS has not explained in any of its public statements how refusing Ryan White Funds premium payments from Plaintiffs, rather than refusing payments only from hospitals,

23

other healthcare providers, and other commercial entities, furthers BCBS's purported goal of safeguarding against patient-steering by private actors and other fraudulent activity.

117. BCBS's justification based solely on BCBS's characterization of the policy is unsupported by any regulatory guidance and is explicitly negated by the February 2014 Regulatory Guidance.

118. The vast majority of Blue Cross and Blue Shield affiliates across the country have not adopted this policy.

***Defendants' True Motivation in Refusing Ryan White Funds Is to Exclude Individuals Based on Their HIV/AIDS Status from Defendants' Insurance Rolls***

119. In reality, Defendants' policy is intended to exclude Louisianans living with HIV who cannot by themselves afford to pay the premiums for the health insurance offered by Defendants.

120. Defendants are motivated to keep people living with HIV off their insurance rolls and reduce the increased costs associated with paying for the care and treatment provided to people living with HIV.

121. This is demonstrated in an email made public via various news outlets, in which a Congressional staffer in Senator Mary Landrieu's office reported that,

> ***BCBS LA told me their decision was not due to the CMS [Centers for Medicare & Medicaid Services] guidance or any confusion (as we thought before) but was in fact due to adverse selection concerns.***

(Emphasis added.)

122. As defined by the National Association of Insurance Commissions:

Adverse selection . . . occurs whenever people make insurance purchasing decisions based on their own knowledge of their insurability or likelihood of making a claim on the insurance coverage in question. This can happen in a variety of ways. For example, the applicant might have information about the risk that is not known to the insurer, or the insurer might have access to the

24

information but be unable to incorporate it fully into the price of coverage, due to factors such as antidiscrimination laws . . .

*Adverse Selection Issues and Health Insurance Exchanges Under the Affordable Care Act*, Nat'l Ass'n of Ins. Comm'rs (2011), *available at* http://www.naic.org/store/free/ASE-OP.pdf.

123.    People living with HIV have medical needs requiring regular doctor visits (preferably with an infectious disease specialist), periodic blood tests and other lab work, and uninterrupted access to the medications they take on a daily basis.

124.    Without regular medical care and monitoring and continuous access to (often expensive) medications, people living with HIV face the strong likelihood of a deteriorating immune function, debilitating illness, and premature death.

125.    In light of their pressing need for consistent medical care and their lack of sufficient resources to pay for such care out of pocket, Plaintiffs' need for health insurance is particularly high.

126.    Pursuant to Affordable Care Act reforms effective January 1, 2014, Plaintiffs cannot be prevented from purchasing most private health insurance plans, including Defendants', from which they historically have been excluded based on pre-existing condition exclusions.

127.    The Affordable Care Act's reforms also prevent insurers from denying claims or basing premiums on a person' pre-existing condition, such as HIV or AIDS.

128.    Plaintiffs' elevated need for health care and correspondingly high demand for health insurance, combined with the Affordable Care Act's provisions preventing Defendants from discriminating against people living with HIV in coverage or in premium cost, is consistent with BCBS's admission to Senator Landrieu's aide that its policy not to accept Ryan White Funds is intended to exclude Plaintiffs and thereby avoid "adverse selection."

25

129. Defendants' sudden refusal to accept Ryan White Funds also has the *effect of* discriminating against people living with HIV.

130. By definition, all individuals eligible for Ryan White HIV/AIDS Program are living with HIV (or AIDS) and find themselves currently unable to afford private health insurance premiums without Ryan White Funds.

131. Accordingly, 100% of those affected by Defendants' refusal to accept Ryan White Funds are individuals with a disability as defined by the Rehabilitation Act, and 100% of those affected will be unable to purchase health insurance on the federal exchange or otherwise.

132. Tellingly, in its February 13, 2014 media release, BCBS specifically assured the public that Ryan White HIV/AIDS Program recipients were not the only individuals affected by its new policy of refusing third party payments.

133. BCBS, however, cited only one example, concluding that "some Louisiana universities pay for student athletes' premiums. This policy affects them as well."

134. Like its justification for its discriminatory policy, BCBS's conclusory attempt to paint its policy as one of general application appears wholly unsupported.

135. In fact, Louisiana State University, the largest public university in Louisiana, has stated that BCBS's policy does not affect it or its student athletes.

*Defendants' Abrupt Change in Policy to Refuse Ryan White Funds Leaves Plaintiffs with No Access to Health Insurance*

136. In early February 2014, after BCBS publicized its plan to refuse Ryan White funds, Defendant Louisiana Health Cooperative, announced it too would refuse Ryan White Funds. The remaining Defendant, Vantage, announced that it would reexamine its policy of accepting Ryan White Funds in the near future, signaling an intent to adopt positions similar to

26

BCBS's and Louisiana Health Cooperative's if those insurers are allowed to continue their practice.

137.    The concerted effort by these three insurers to exclude Plaintiff Ryan White HIV/AIDS Program beneficiaries effectively freezes Plaintiffs out of the federal health insurance exchange—the only market offering affordable health insurance plans that cannot exclude Plaintiffs or charge more on the basis of their HIV or AIDS diagnosis.

138.    BCBS, the Louisiana Health Cooperative, and Vantage, represent three out of the four Louisiana health insurers that offer plans on the federal health insurance exchange.

139.    The fourth insurer offering health insurance through the federal insurance exchange offers policies in only Jefferson Parish.

140.    According to BCBS's own media release, BCBS is the only "meaningful" state-wide insurance option offered in the federal exchanges in Louisiana:

> [BCBS] is the only insurer that is fully participating in the Marketplace, offering plans at every metal level in every parish and every ZIP code in the state. . . . Our competition has chosen, for the most part, not to participate in any meaningful way.

141.    With Defendants' new discriminatory policy in place, there are no health insurance policies offered through the federal insurance exchange that cover the other 63 Parishes of Louisiana (besides Jefferson Parish) in which Plaintiffs could participate, because now no provider of such policies accepts Ryan White Funds premium payments.

142.    As noted above, Plaintiffs fall into Louisiana's insurance gap of individuals who do not qualify for Medicaid, Medicare, or other federal health care programs, but who cannot afford private health care insurance on their own.

143.    Beyond their need for Ryan White Funds to afford their insurance premiums, Plaintiffs are qualified to participate in and receive the benefits of their existing or prospective

health insurance plans.  The lone obstacle to Plaintiffs retaining or obtaining insurance is Defendants' sudden refusal to accept Ryan White Funds.

144.    The introduction of the Affordable Care Act's health insurance exchanges offered new and more favorable options to Insured Plaintiffs with existing policies, and finally offered to Plaintiffs currently without insurance an opportunity to secure insurance and not be turned away or gouged based on an HIV or AIDS diagnosis.

145.    Plans purchased outside of an exchange are far less likely to be affordable because Plaintiffs will not be eligible for premium credits or cost sharing subsidies, as they will be in connection with plans purchased through an exchange.

146.    Even the plans in the federal exchange, however, despite the availability of premium credits and cost-sharing subsidies, are still too costly for Plaintiffs to carry the premiums themselves, making Ryan White Funds essential for Plaintiffs to be able to participate in, and enjoy the benefits of, the new market of health insurance free of discrimination based on disability or pre-existing conditions.  Defendants know this fact.

147.    With the major market player, BCBS, refusing Ryan White Funds, and with *all* insurance options outside of Jefferson Parish doing likewise (or, as to Vantage, threatening to do so in the near future), Defendants' discriminatory policy freezes Plaintiffs out of any access to health care coverage.

148.    Even Plaintiffs living in Jefferson Parish, from whom one insurer may accept Ryan White Funds, are frozen out of coverage from BCBS, who, by its own assertion, is the only health insurer "to participate [in the exchange] in any meaningful way."

28

***The Effect of Defendants' Intentional Discrimination Could Mean Illness and Death for
Plaintiffs Forced Off Their Insurance Coverage***

149.   The circumstances facing Plaintiffs due to Defendants' intentionally

discriminatory policy could not be more dire.

150.   Plaintiff John East described the effect of this policy as being a "matter of life and

death."

151.   As set forth above, most Plaintiffs must take a number of costly prescription drugs

every day, in various combinations tailored to boost their individual immune systems.

152.   These drugs literally keep Plaintiffs alive.  As Plaintiff John East has stated, "I

could die if I don't get my meds."

153.   To ensure that the medications remain effective and that the virus has not mutated

and developed a resistance to the particular medications being taken, Plaintiffs also must engage

in routine doctor visits and regularly undergo blood work and other medical monitoring tests.

154.   Without health insurance coverage, the Plaintiff class members, including

Plaintiff John East, cannot afford any of the care that they need to remain healthy and,

ultimately, to stay alive.

155.   With Defendants' policy of refusing Ryan White Funds in place, premiums due

this month will go unpaid, Plaintiffs' prescriptions will begin to run out, and Plaintiffs may be

turned away from their health care providers if there is uncertainty as to whether their coverage

remains in place.

156.   In addition, the health effects of losing—or even the threat of losing—health

coverage for Plaintiffs, who so desperately depend on it, substantially impair Plaintiffs' ability to

work and support themselves and their families.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF- AS TO THE PLAINTIFF CLASS
(Intentional discrimination in violation of section 1557(a) of the
Patient Protection and Affordable Care Act)

157. Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

158. Defendants meet the qualifications for being a "health program or activity, any part of which is receiving Federal financial assistance" under section 1557 of the Affordable Care Act.

159. Plaintiffs are "individual[s] with a disability" under section 504 of the Rehabilitation Act.

160. Plaintiffs are qualified to participate in and receive the benefits of their respective health insurance plans.

161. Defendants have violated and continue to violate section 1557(a) of the Affordable Care Act by intentionally causing Plaintiffs to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance" based on their disability, which is a prohibited ground of discrimination under section 504 of the Rehabilitation Act.

162. Plaintiffs have been aggrieved by this violation of section 1557 of the Affordable Care Act and have no adequate remedy at law for Defendants' violation of their rights. Defendants' unlawful discrimination will irreparably harm Plaintiffs because they will be unable to obtain necessary medical care.

163. Declaratory and injunctive relief are required to define Plaintiffs' rights under section 1557 and related statutes, to remedy the Defendants' violation of section 1557 of the

Affordable Care Act, and to secure ongoing compliance with the antidiscrimination provisions of

the Affordable Care Act and incorporated federal law

**SECOND CLAIM FOR RELIEF- AS TO THE PLAINTIFF CLASS**
**(Disparate impact discrimination in violation of section 1557(a) of the**
**Patient Protection and Affordable Care Act)**

164.    Plaintiff realleges and incorporates, as though fully set forth herein, each and

every allegation contained above.

165.    Even if Defendants did not act with discriminatory intent, Defendants' refusal to

accept premium payments from third parties other than those CMS considers to be potentially

problematic has a disparate impact on individuals with a disability, namely their HIV or AIDS

diagnosis, who as a result of Defendants' policy necessarily will be denied meaningful access to,

excluded from participation in, and denied the benefits of any health program or activity, any

part of which is receiving Federal financial assistance, in violation of Affordable Care Act

section 1557(a).

166.    Plaintiffs' request that Defendants maintain the status quo and continue to accept

Ryan White Funds—as they have for years—requests only a "reasonable accommodation"

under, not a substantial modification to or fundamental alteration of, Defendants' insurance

programs, to ensure Plaintiffs meaningful access to Defendants' health insurance.

167.    Plaintiffs have been aggrieved by this violation of section 1557 of the Affordable

Care Act and have no adequate remedy at law for the Defendants' violation of their rights.

Plaintiffs will be irreparably harmed by Defendants' unlawful discrimination by being unable to

obtain necessary medical care.

168.    Declaratory and injunctive relief are required to define Plaintiffs' rights under

section 1557 and related statutes, to remedy the Defendants' violation of section 1557 of the

31

Affordable Care Act, and to secure ongoing compliance with the antidiscrimination provisions of the Affordable Care Act.

### THIRD CLAIM FOR RELIEF- AS TO THE PLAINTIFF CLASS
**(Employment of unlawful marketing practice to discourage enrollment in health insurance plans by individuals with significant health needs in violation of section 1311(c)(1)(A) of the Patient Protection and Affordable Care Act)**

169.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

170.    Defendants offer "qualified health plans" on federal insurance exchanges established under the Affordable Care Act.

171.    Defendants' refusal to accept Ryan White Funds is a "marketing practice[] . . . that [has] the effect of discouraging the enrollment in [Defendants' insurance plans] by individuals with significant health needs," namely individuals with HIV or AIDS.

172.    Plaintiffs have been aggrieved by this violation of section 1311 of the Affordable Care Act and have no adequate remedy at law for the Defendants' violation of their rights. Plaintiffs will be irreparably harmed by Defendants' unlawful discrimination by being unable to obtain necessary medical care.

173.    Declaratory and injunctive relief are required to define Plaintiffs' rights under section 1311, to remedy the Defendants' violation of section 1311 of the Affordable Care Act, and to secure ongoing compliance with the antidiscrimination provisions of the Affordable Care Act.

### FOURTH CLAIM FOR RELIEF - AS TO THE PLAINTIFF CLASS
**(Violation of the Guaranteed Availability requirements of section 2702 of the Public Health Service Act)**

174.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

32

175.    Defendants offer health insurance coverage in the individual and group markets of Louisiana.

176.    By engaging in discriminatory marketing practices prohibited by section 1311 of the Affordable Care Act, Defendants refused to accept each individual in Louisiana who applied for coverage and thus violated the guaranteed availability requirements of section 2702 of the Public Health Service Act (42 U.S.C. § 300gg-1), as amended by section 1201 of the Affordable Care Act.

177.    Defendants' refusal to accept Ryan White Funds is a "marketing practice[] . . . that [has] the effect of discouraging the enrollment in [Defendants' insurance plans] by individuals with significant health needs," namely individuals with HIV or AIDS.

178.    Plaintiffs have been aggrieved by this violation of section 2702 of the Public Health Service Act and have no adequate remedy at law for the Defendants' violation of their rights.  Plaintiffs will be irreparably harmed by Defendants' unlawful discrimination by being unable to obtain necessary medical care.

179.    Declaratory and injunctive relief are required to define Plaintiffs' rights under section 1311, to remedy the Defendants' violation of section 2702 of the Public Health Service Act, and to secure ongoing compliance with the antidiscrimination provisions of the Affordable Care Act.

## FIFTH CLAIM FOR RELIEF- AS TO THE PLAINTIFF CLASS
### (Equitable Estoppel)

180.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

Case 3:14-cv-00115-BAJ-RLB   Document 1   02/20/14   Page 33 of 41

181.    Defendants have, by their words and conduct, long represented that they will receive and accept Ryan White Funds as payment for health insurance premiums and that those payments will be treated no differently than any other health insurance premium payments.

182.    Insured Plaintiffs have justifiably relied on Defendants' policy and custom of accepting Ryan White Funds.

183.    Insured Plaintiffs have maintained, renewed, or applied for health insurance policies offered by Defendants, and have forborn from making alternative arrangements based on their justifiable reliance induced by Defendants.

184.    As a result of Defendants' abrupt change in position that Defendants now will not accept Ryan White Funds, Insured Plaintiffs have been aggrieved, and have been and will continue to be irreparably harmed by being unable to obtain necessary medical care and medications.

185.    Injunctive relief is required to equitably estop Defendants from changing their longstanding policy of accepting Ryan White Funds.

### SIXTH CLAIM FOR RELIEF- AS TO INSURED PLAINTIFFS
### (Breach of Contract)

186.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

187.    A valid insurance contract exists between BCBS and Plaintiff John East, and exists or has existed as well as between one of more Defendants and all other Insured Plaintiffs.

188.    Defendants are under an obligation to provide health insurance coverage to Insured Plaintiffs in exchange for receiving health insurance policy premium payments.

34

189.    Plaintiff John East and Insured Plaintiffs have performed all the obligations required of them under their policies, and remain ready, willing, and able to continue performing, including allowing the continued payment of their health insurance premiums.

190.    Any term in Insured Plaintiffs' insurance policy with Defendants relating to the refusal of third party payments is waived and modified by Defendants' past conduct.

191.    Unfairly discriminating against individuals with like insuring risk in the terms or conditions of any insurance contract violates the Louisiana Insurance Code, including without limitation, section 22:1964(7)(c) and section 22:34.

192.    Any term in Insured Plaintiffs' insurance policy with Defendants relating to the refusal of third party payments is void as against Louisiana public policy and must be read out of any insurance policy, rider, or endorsement issued by Defendants, pursuant to the Louisiana Insurance Code section 22:861(4) and section 22:880.

193.    Defendants breached their contractual obligations by refusing to accept premium payments on Insured Plaintiffs' accounts, whether received from the Ryan White HIV/AIDS Program (via the Louisiana Health Insurance Program or the HIV/AIDS Alliance) or otherwise.

194.    Defendants' refusal to accept Insured Plaintiffs' premium payments constitutes a unilateral repudiation of Defendants' contractual obligations to cover Insured Plaintiffs during the policy term so long as premium payments are made.

195.    As a result of Defendants' breach of their agreement to provide health insurance coverage, Insured Plaintiffs have been aggrieved, and have been and will continue to be irreparably harmed by being unable to obtain necessary medical care and medicine.

196.    Monetary damages are not adequate to remedy Defendants' breach of their contractual obligations.

35

197.    Declaratory and injunctive relief are required to define Plaintiffs' rights under their insurance policies and to require specific performance by Defendants of their vital contractual obligations.

## SEVENTH CLAIM FOR RELIEF- AS TO INSURED PLAINTIFFS
### (Breach of the Duty of Good Faith and Fair Dealing)

198.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

199.    Defendants owe a duty of good faith and fair dealing to Insured Plaintiffs, their insureds.

200.    Defendants have breached their duties of good faith and fair dealing not to discriminate against individuals with like insuring risk in the terms or conditions of any insurance contract, pursuant to the Louisiana Insurance Code section 22:1964(7)(c) and section 22:34.

201.    Defendants have breached their duties of good faith and fair dealing not to misrepresent to Insured Plaintiffs over a period of time that they would accept premium payments to induce Insured Plaintiffs to continue choosing Defendants' health insurance coverage when Defendants knew they later would not accept such payments, pursuant to the Louisiana Insurance Code section 22:1964(14)(a).

202.    As a result of Defendants' breaches of their duties of good faith and fair dealing, Insured Plaintiffs have been aggrieved, and have been and will continue to be irreparably harmed by being unable to obtain necessary medical care and medicine.

203.    Declaratory and injunctive relief are required to enjoin Defendants from their continued and ongoing breaches of their duties not to discriminate and not to mislead Insured Plaintiffs.

36

## EIGHTH CLAIM FOR RELIEF - AS TO INSURED PLAINTIFFS
### (Negligent Misrepresentation)

204.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained above.

205.     Defendants owe a duty of care to Insured Plaintiffs, their insured.

206.     Defendants have a pecuniary interest in their relationship with Insured Plaintiffs insured by Defendants.

207.     Defendants have long represented, for the guidance of Insured Plaintiffs, that Defendants will receive and accept Ryan White Funds as payment for health insurance premiums and that those payments will be treated no differently than any other health insurance premium payments.

208.     Defendants carelessly maintained that guidance even after including in some of their insurance policies terms relating to the refusal of third party payments, continuing to induce Insured Plaintiffs' reliance in maintaining and applying for Defendants' health insurance plans.

209.     Defendants carelessly maintained that guidance even immediately before Defendants announced their refusal to accept Ryan White Funds, continuing to induce Insured Plaintiffs' reliance in maintaining and applying for Defendants' health insurance plans.

210.     Insured Plaintiffs justifiably relied on Defendants' policy and custom of accepting Ryan White Funds.

211.     Insured Plaintiffs have maintained, renewed, or applied for health insurance policies offered by Defendants, and have forborn from making alternative arrangements based on their justifiable reliance induced by Defendants.

212.     As a result of Defendants' longstanding practice of accepting Ryan White Funds followed by Defendants' abrupt change in position, Defendants breached their duty of care to

37

Insured Plaintiffs and Insured Plaintiffs have been aggrieved, and have been and will continue to be irreparably harmed by being unable to obtain necessary medical care and medicine.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter an Order

(a) Certifying the proposed class and subclasses of Plaintiffs;

(b) With respect to the class:

    (i) Enjoining Defendants from changing their policy of accepting Ryan White HIV/AIDS Program funds from current or prospective applicants to, or policy holders of, Defendants' health insurance plans;

    (ii) Enjoining Defendants from implementing or executing their new policy of refusing Ryan White HIV/AIDS Program funds from current or prospective applicants to, or policy holders of, Defendants' health insurance plans; and

    (iii) Declaring that Defendants' actions described above constitute discrimination in violation of section 1557 of the Affordable Care Act;

    (iv) Estopping Defendants from taking the position of refusing to accept Ryan White HIV/AIDS Program funds for Plaintiffs' health insurance premium payments; and

(c) With respect to the subclass of Insured Plaintiffs:

    (i) Requiring specific performance by Defendants of their contractual obligations to accept Ryan White HIV/AIDS Program premium payments from Plaintiffs currently insured by Defendants, and to maintain coverage so long as such premium payments are received;

    (ii) Declaring that Defendants' actions described above constitute unfair discrimination in violation of Louisiana Revised Statute section 22:1964(7) and is therefore void pursuant to Louisiana Revised Statute 22:861(4) and section 22:880;

    (iii) Declaring that Defendants' actions described above constitute a breach of Defendants' contractual obligations to Plaintiffs currently insured by Defendants;

    (iv) Declaring that Defendants' actions described above constitute a breach of Defendants' duty of good faith and fair dealing to Plaintiffs currently insured by Defendants;

38

(d)     Awarding reasonable attorneys' fees and costs; and

(e)     Awarding other equitable and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted,

Dated: February 20, 2014                    */s/ Harry Rosenberg*_____

ROPES & GRAY LLP
Jeffrey J. Bushofsky (*pro hac vice pending*)
Timothy R. Farrell (*pro hac vice pending*)
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Telephone:  (312) 845-1200
Facsimile:   (312) 845-5500
E-mail: jeffrey.bushofsky@ropesgray.com

-AND-

ROPES & GRAY LLP
Amanda R. Phillips (*pro hac vice pending*)
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone:  (617) 951-7000
Facsimile:   (617) 951-7050
E-mail: amanda.phillips@ropesgray.com

-AND-

ROPES & GRAY LLP
Anthony C. Biagioli (*pro hac vice pending*)
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948
Telephone:  (202) 508-4776
Facsimile:   (202) 508-4650
Email: anthony.biagioli@ropesgray.com

-AND-

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
Scott A. Schoettes (*pro hac vice pending*)
Kenneth D. Upton (*pro hac vice pending*)
Susan L. Sommer (*pro hac vice pending*)
120 Wall Street, 19th Floor
New York, NY 10005-3904
Telephone:  (212) 809-8585
Facsimile:   (212) 809-0055
E-mail:
        sschoettes@lambdalegal.org

40

kupton@lambdalegal.org
ssommer@lambdalegal.org

-AND-

PHELPS DUNBAR LLP
Harry Rosenberg (Bar No. 11465)
Bryan Edward Bowdler (Bar No. 32097)
365 Canal Street, Suite 2000
New Orleans, LA 70130
Telephone:  (504) 584-9219
Facsimile:  (504) 568-9130
E-mail: harry.rosenberg@phelps.com
        bryan.bowdler@phelps.com

*Attorneys for Plaintiff John East and all others*
*similarly situated*

41